# UNITED STATES DISTRICT COU8RT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AURIZA VEGA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-3516 |
| | ) | |
| THE CHERRY CORPORATION LONG | ) | Hon. Marvin E. Aspen |
| TERM DISABILITY BENEFITS PLAN | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

Presently before us are cross-motions for summary judgment filed by Plaintiff Auriza Vega and Defendant The Cherry Corporation Long Term Disability Benefits Plan (the "Plan") and the Plan's motion to strike. For the reasons state below, we deny both motions and grant the Plan's motion to strike.

## SUMMARY OF THE FACTS[1]

Vega was employed by The Cherry Corporation ("Cherry Corp.") and was a covered participant under the Plan before she stopped working on October 20, 1998. (Def.'s 56.1(a)(3) Stmt. ¶ 1.) Continental Casualty Corporation insured the Plan under a group policy ("Policy"[2])

---

[1] Unless otherwise noted, the facts described herein are undisputed. We primarily rely on the parties' Local Rule 56.1 statements of uncontested facts. However, where necessary due to mistake or for clarity, we will cite to the Administrative Record ("AR").

[2] For the sake of clarity and distinguishing between the Plan and the pertinent documents, we refer to the documents that governed the Plan as the Policy.

issued to The Cherry Corp. and provided disability benefits to its employees who suffered from a Total Disability. (*Id.* ¶ 2.) Beginning in July 2007, Hartford Life and Accident Insurance Company ("Hartford") served as the underwriter of the policy and assumed responsibility for evaluating and administering claims made under the Plan. (*Id.* ¶ 3.) In March 1999, Vega filed a claim for long-term disability ("LTD") benefits due to arthritis. (*Id.* ¶ 5; Pl.'s 56.1(a)(3) Stmt. ¶ 3.) Vega's claim was denied and she unsuccessfully appealed that determination. (Def.'s 56.1(a)(3) Stmt. ¶¶ 6-8.) Vega then filed a suit in the Northern District of Illinois for review of that determination under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1991 *et. seq.* ("ERISA") and was granted summary judgment in her favor. (Def.'s 56.1(a)(3) Stmt. ¶ 8.) Accordingly, Vega received LTD benefits from April 18, 1999 through July 18, 2007. (*Id.* ¶ 9.)

In July 2007, Hartford terminated Vega's LTD benefits when it concluded that she was not Totally Disabled, based on reports from Vega's treating physicians, an independent physician, and an Assessment of Employability conducted by Hartford. (*Id.* ¶ 11; Pl.'s 56.1(a)(3) Stmt. ¶¶ 6-16.) Under the Policy,

> 'Total Disability' means that, because of Injury or Sickness, the Insured Employee is:
>
> (1) continuously unable to perform the substantial and material duties of his regular occupation;
> (2) under the regular care of a licensed physician other than himself; and
> (3) not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.
>
> After the Monthly Benefit has been payable for the Insured Employee Occupation Period shown in Statement 4 of the Application, 'Total Disability' means that because of Injury or Sickness, the Insured Employee is:
>
> (1) continuously unable to engage in any occupation for which he is or becomes qualified by education, training, or experience; and

(2) under the regular care of a licensed physician other than himself.

(Def.'s 56.1(a)(3) Stmt. ¶ 4, AR 00054.)  The Insured Employee Occupation Period referred to in that definition is 24 months.  (*Id.* ¶ 4, AR 00043.)

## A.  Physical Health Issues

Vega has experienced various health problems since 1995.  She was diagnosed with systemic lupus erythematosus in 1995 (*id.* ¶ 12) and with rheumatoid arthritis, primarily affecting her knees, shoulders and wrists, in 1999 (*id.* ¶ 13, AR 00462).  Her rheumatoid arthritis resulted in swelling and loss of range of motion in her hands, knees, shoulders, and wrists.  (*Id.* ¶ 14.)  In 2001, Vega began seeing Dr. Fetter, an orthopedic specialist, regarding stability problems in her knees.  (*Id.* ¶¶ 15-16.)  He indicated that he found "hypermobility of Vega's bilateral patella" and "no significant instability pattern," and recommended that she use slip-on knee supports and undergo rehabilitation.  (*Id.* ¶ 16.)  Since 2001, Vega's medical records contain no references to her lupus diagnosis and contain only occasional references to her knee pain.  (*Id.* ¶ 18.)

In August 2001, Vega began complaining of low-back pain.  She saw her internist, Dr. Martinez, who prescribed medication for this condition.  (*Id.* ¶ 19.)  Dr. Martinez ordered a diagnostic test, which was performed in October 2001 and indicated that Vega had "mild spurring consistent with mild degenerative joint disease."  (*Id.* ¶ 20, AR 00326.)  In May 2001, Dr. Martinez prescribed additional medication for Vega's complaints of back, knee, and shoulder pain.  (*Id.* ¶ 21, AR 00334; Pl.'s Resp. Def.'s 56.1(a)(3) Stmt. ¶ 21.)  In July 2001, Vega complained of back pain that radiated across her left side, which Dr. Martinez treated with prescription medication.  (*Id.* ¶ 22.)  A July 12, 2002 MRI conducted on Vega's spine showed a

"small left paramedian disc herniation at L2-L3" and "slight bulging of the L4-L5 disc." (*Id.* ¶ 23, AR 00324.) The Plan states that Vega did not complain about her back at her next visit on September 12, 2002. (Def.'s 56.1(a)(3) Stmt. ¶ 24) However, the only legible portion of Dr. Martinez's notes for that visit indicate that Vega did complain of sharp pain, though it is not clear where the pain was located. (AR 00334.) At her next two visits, Vega complained of continued back pain. (Def.'s 56.1(a)(3) Stmt. ¶¶ 25-26.) During the second of those visits, on February 18, 2003, Dr. Martinez recommended that Vega consult a neurosurgeon about her herniated disc. (*Id.* ¶ 26.) Although at that time she told Dr. Martinez she would think about it, she stated in October 2004 that she would not have back surgery. (*Id.* ¶¶ 26, 29.) Vega continued to complain of continued back pain at her May 20, 2003 visit with Dr. Martinez, but stated that the pain did not radiate across her body anymore. (*Id.* ¶ 27.) Although she saw Dr. Martinez three times between May 2003 and January 2004, she did not complain of pack pain again until April 2004. (*Id.* ¶ 28.)

Over the next two years, Dr. Martinez continued to treat Vega for back pain and other symptoms. (*Id.* ¶¶ 28-34.) In May 2005, Dr. Martinez stated that she was not suffering from any neurological deficits related to her pain and continued her treatment with prescription medications. (*Id.* ¶ 30.) In his Attending Physician's Statement of Continued Disability ("APS") completed on July 14, 2005 ("July 2005 APS"), Dr. Martinez stated that Vega's condition was "unchanged" and that she continued to complain of low-back pain. (*Id.* ¶ 30, AR 00369.) Dr. Martinez further opined that Vega had the following activity limitations: standing – one to two hours; walking – 15 minutes at a time; sitting – six to eight hours a day; lifting/carrying – limited to ten pounds; reaching/working overhead – normal; pushing – limited;

pulling – limited; driving – occasionally. (*Id.* ¶ 32, AR 00370.) On December 29, 2006, Dr. Martinez completed another APS ("December 2006 APS"), in which he indicated that her primary diagnosis was herniated lumbar disc with radiculopathy, her secondary diagnosis was restless leg syndrome, and her subjective symptoms were low-back and leg pain. (*Id.* ¶ 37, AR 00307.) At that time, he recommended the following limitations on Vega's activities: limited standing and walking and no lifting, carrying, pushing, pulling, or keyboard use/repetitive hand motion. (*Id.* ¶ 38, AR 00308.) He further stated that she was able to reach/work overhead and sit, and that she could occasionally drive. (*Id.*)

Additionally, an October 2006 neurological examination of Vega conducted by Dr. Chhabria, a neurologist, demonstrated that Vega did not have any signs of autotomic dysfunction and that she performed normally in all of the tested areas, with the exception of a decreased right ankle jerk. (*Id.* ¶ 35, AR 00241.) He concluded that she suffered from restless leg syndrome, lumbar disc herniation with radiculopathy, anxiety disorder, and gastroesophageal reflux disease ("GERD"). (*Id.* ¶ 36.) He instructed her to conduct back-strengthening exercises and scheduled an electromyogram of her right lower extremity. (*Id.*, AR 00242.)

## B. Panic/Anxiety Issues

In 2005, Vega began seeing Dr. Reddy, a psychiatrist, after she complained of being "nervous and jumpy" during the previous year. (*Id.* ¶ 41, AR 00274.) At her first visit with Dr. Reddy, Vega reported that she was unable to go into crowded places by herself and that she experienced feelings of dizziness, fearfulness, and numbness in her hands. (*Id.* ¶ 42; Pl.'s Resp. to Def.'s 56.1(a)(3) Stmt. ¶ 44, AR 00274.) Dr. Reddy diagnosed Vega with panic disorder and agoraphobia. (Def.'s 56.1(a)(3) Stmt. ¶ 42.) At Vega's next visit with Dr. Reddy on August 12,

2005, she indicated that her anxiety and depression were lower, but Dr. Reddy gave her samples of Effexor to take daily.  (*Id.* ¶ 43.)  Vega saw Dr. Reddy twice more in 2005 and reported both times that she was "okay," and Dr. Reddy continued treating her with Effexor.  (*Id.* ¶¶ 43-44.)  In December 2005 Dr. Reddy completed an APS ("December 2005 APS"), which indicated that Vega's symptoms were "panic attacks, insomnia, worrying a lot, [and] pain in her knees."  (*Id.* ¶ 45, AR 00375.)  He also stated that Vega was "alert, . . . currently not having any panic attacks, [and that] meds seem to control her panic attacks."  (*Id.*)  He further indicated that although her affect was appropriate and her attitude cooperative, she was exhibiting symptoms of an anxious mood.  (*Id.*, Pl.'s Resp. to Def.'s 56.1(a)(3) Stmt. ¶ 45.)  Dr. Reddy opined that she was unable to work due to these issues, even with accommodations.  (Def.'s 56.1(a)(3) Stmt. ¶ 47, AR 00376.)

Vega continued to see Dr. Reddy for her anxiety issues.  In March 2006, Dr. Reddy continued treating Vega with Effexor, after she stated that she was "feeling okay," but was sometimes nervous.  (*Id.* ¶ 47.)  In August 2006, Dr. Reddy increased her Effexor dosage from 75 milligrams per day to 150 milligrams – one 75 milligram dose taken twice daily.  (*Id.* ¶ 49.)  However, three months later, after Vega reported "feeling okay" and that she did not have any new complaints, Dr. Reddy reduced her prescription back to 75 milligrams of Effexor daily.  (*Id.* ¶ 50.)  Dr. Reddy increased this dosage again, to 100 milligrams of Effexor, in January 2007, when she reported that she was experiencing difficulty sleeping and feeling "anxious and panicky at times."  (*Id.* ¶ 51.)  Dr. Reddy completed another APS in February 2007 ("February 2007 APS"), which indicated that Vega was unable to work due to her impairment.  (*Id.* ¶ 54, AR 00292.)  He specifically reported that she was well-groomed, her affect was appropriate, her mood was anxious, she was cooperative, had normal speech, intact judgment, logical and

coherent thought processes and that she did not have any signs of hallucinations, delusions, suicidal or homicidal thoughts, or obsessions. (*Id.* ¶ 53, AR 00292.) He further stated that while her attention was intact, her concentration was mildly impaired and her remote memory was also impaired. (*Id.*) Vega saw Dr. Reddy again in May 2007. (*Id.* ¶ 55.) He instructed Vega to continue taking 100 milligrams of Effexor once daily.

## C. Review

In light of her medical records, Hartford began contacting Vega's physicians to determine whether she still qualified for LTD benefits. In April 2007, Hartford asked Drs. Chhabria and Martinez to comment on Vega's work capacity. (*Id.* ¶ 40, AR 0013-14.) Although Dr. Chhabria refused to comment because he had not seen Vega since October 2006, Dr. Martinez indicated on May 18, 2007 that Vega would be able to perform sedentary work, which was defined in the letter sent by Hartford as work "involv[ing] mostly standing/walking with intermittent periods of sitting.[3] This also involves occasionally lifting up to 10 lbs." (AR 00229.)

Hartford also believed that Vega's medical records demonstrated that her anxiety and

---

[3] There is a dispute as to whether Dr. Martinez's checkmark next to sedentary work meant that he thought she could perform full time or part time work. (*See, e.g.*, Pl. Mem. at 6; Def. Resp. at 4-5.) The letter to Dr. Martinez did not indicate either way whether the work described was full time or part time. (AR 0029 (asking Dr. Martinez whether he "feel[s] that Ms. Vega is capable of returning to some type of employment," and not identifying the number of hours in its definitions of light and sedentary work).) Although Dr. Martinez did not specify in which type of work he believed Vega could engage, Hartford clearly interpreted Dr. Martinez's response as including full time work. (*See* Def. Resp. at 4-5; Assessment of Employability, AR 00214 ("According to the claimant's treating physician, Dr. Martinez, via signature on 5/18/07, claimant is able to perform full time sedentary work.").) At this stage, there is a factual dispute as to whether Dr. Martinez's response should be interpreted as including full time work.

panic disorder had improved and, by letter sent on June 26, 2007, asked Dr. Reddy to update his opinion as to Vega's ability to work. (*Id.* ¶ 57.) Dr. Reddy responded by indicating that he did not think Vega could perform full time work, citing her continued panic attacks and recent increase in medication dosage. (*Id.* ¶ 58, AR 00207.) Hartford retained Reed Review Services ("Reed") to review Vega's records and give an opinion on her functional capacity from a psychiatric point of view. (*Id.* ¶ 59.) Dr. Clark, an independent, Board Certified psychiatrist performed the review for Reed. (*Id.*) In conducting the review, Dr. Clark spoke with Dr. Reddy. Her report summarizing that discussion indicated that Dr. Reddy stated that Vega "has increased anxiety with situational stress . . . but has been without significant episodes for years."[4] (*Id.* ¶ 60, AR 00200.) Dr. Clark concluded, based on her review of Vega's records and her discussion with Dr. Reddy that "there are no psychiatric limitations present that might affect [Vega's] performance in a job setting." (*Id.* ¶ 61, AR 00201.)

With the above reports and Vega's educational background (seventh grade education and no GED) and prior work experience, Hartford completed an Assessment of Employability to determine whether Vega was capable of performing any occupations, and what those

_____

[4] The actual text of Dr. Clark's report states that "[t]he Attending Physician states the claimant has increased anxiety with situational stress, which is normal, but has been without significant panic episodes for years." (AR 00200.) Vega denies this fact, stating that it is not clear from the record that Dr. Reddy actually stated that her situational stress was normal. (Pl.'s Resp. to Def.'s 56.1(a)(3) Stmt. ¶ 60.) She apparently contends that even though Dr. Reddy may have said she "has increased anxiety with situational stress" and that she "has been without significant panic episodes for years," the statement regarding the normality of her anxiety was Dr. Clark's conclusion. (*Id.*) We agree that the inclusion of the phrase "which is normal" is vague. This statement could have several meanings, regardless of who said it. Dr. Reddy may have actually made the statement, meaning that someone with increased anxiety, like Vega, may normally have situational stress. It could also mean that Dr. Clark opined that Vega's symptoms were normal. Because we cannot determine who made that statement or its meaning, we agree that it is a disputed fact.

-8-

occupations might be. (*Id.* ¶ 67.) The Assessment of Employability assumed that Vega was capable of completing full time sedentary work, based on its interpretation of Dr. Martinez's May 2007 response. (Pl.'s Resp. to Def.'s 56.1(a)(3) Stmt. ¶ 67, AR 00214.) The Assessment of Employability concluded that Vega "has the ability to perform short cycled work and follow instructions," and that she "possesses the skills required to perform alternative unskilled occupations," including motor polarizer,[5] masker[6] and document preparer.[7] (*Id.* ¶ 71, AR 00213-14.)

Based on all of the reports, Vega's medical reports, and the Assessment of Employability, Hartford concluded that Vega was no longer disabled as defined by the Policy and terminated her benefits as of July 18, 2007. (*Id.* ¶ 75.) In its letter to Vega explaining its decision to terminate her benefits, Hartford stated that Dr. Martinez had indicated that she was capable of performing full time sedentary work. (Pl.'s 56.1(a)(3) Stmt. ¶ 9.) The letter also referred to Dr. Clark's conversation with Dr. Reddy and stated that "Dr. Reddy stated that you have had problems with anxiety and 'situational stress, which is normal, but has been without significant panic episodes for years.'" (*Id.* ¶ 11, AR 00123.) Vega appealed that determination, but did not submit any additional medical evidence to support her claim. (Def.'s 56.1(a)(3) Stmt. ¶ 76.) Hartford upheld the termination of benefits on August 14, 2007, relying in part on Dr.

_____

[5] A motor polarizer "[p]olarizes motors used in times and clocks, using electromagnet[s]." (*Id.* ¶ 74, AR 00224.)

[6] A masker "[b]rushes lacquer in second track recess of timepiece dial to prevent removal of finish during polishing and brushes lacquer over tyrlons (numerical markings) of dial to prevent trylons from being plated during dial-plating operation[s]." (*Id.* ¶ 73, AR 0221.)

[7] A document preparer "[p]repares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices." (*Id.* ¶ 72, AR 00217.)

Martinez's alleged statement that Vega could perform full time sedentary work and that, as

explained in Dr. Clark's report, Dr. Reddy indicated that "no functional limitations were noted

due to a psychiatric illness." (*Id.* ¶ 18, AR 00117.)

## STANDARD OF REVIEW

Summary judgment is proper only when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56©. A genuine

issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505,

2510 (1986). This standard places the initial burden on the moving party to identify "those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)

(internal quotations omitted). Once the moving party meets this burden of production, the

nonmoving party "may not rest upon the mere allegations or denials of the adverse party's

pleading" but rather "must set forth specific facts showing that there is a genuine issue [of

material fact] for trial." Fed. R. Civ. P. 56(e). "In reviewing cross-motions for summary

judgment, we view all facts and draw all reasonable inferences in a light most favorable to the

party against whom the motion is made." *Tate v. Long Term Disability Plan for Salaried

Employees of Champion Int'l Corp. # 506*, 545 F.3d 555, 559 (7th Cir. 2008); *Gazarkiewicz v.

Town of Kingsford Heights, Ind.*, 359 F.3d 933, 939 (7th Cir. 2004). The court cannot make

credibility determinations or weigh conflicting evidence at this stage. *See Anderson*, 477 U.S. at

249, 255, 106 S. Ct. at 2511, 2513; *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). However, "our favor toward the nonmoving party does not extend to drawing 'inferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)). Therefore, the non-moving party cannot merely "raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

"A claim for benefits under an ERISA-governed plan is a matter of contract interpretation. When there are no triable issues of fact, . . . contract interpretation is a subject particularly suited to disposition by summary judgment." *Bechtold v. Physicians Health Plan of N. Ind., Inc.*, 19 F.3d 322, 325 (7th Cir. 1994). Furthermore, "[t]he interpretation of an unambiguous contract is a question of law for the court." *Id.* Here, neither party has argued that the contract is ambiguous.[8] Vega's claims arise under ERISA's civil enforcement provision, 28 U.S.C. § 1132(a)(1)(B), which allows a participant in an ERISA plan to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In reviewing ERISA claims, we apply a *de novo* standard of review unless the

---

[8] Under the Policy, the definition of Total Disability changes after the Insured Employee Occupation Period has passed. (Def.'s 56.1(a)(3) Stmt. ¶ 4.) Prior to the end of that period, Total Disability means that one cannot perform the duties of her "regular occupation"; after that period it means that one cannot perform the duties of "any occupation for which [she] is or becomes qualified by education, training or experience." (*Id.*, AR 00054.) Although Vega contends that the record does not establish the length of the Insured Employee Occupation Period (Pl. Mem. at 5), she is incorrect. (Def.'s 56.1(a)(3) Stmt. ¶ 4, AR 00043 ("Insured Employee Occupation Period: 24 months.").) Because the Policy clearly identifies the length of that period, the contract is unambiguous as to the definition of Total Disability.

Plan grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989); *Ramsey v. Hercules Inc.*, 77 F.3d 199, 202 (7th Cir. 1996). The parties agree that the Policy did not give discretion to the Plan Administrator and that *de novo* review applies. (Pl. Mem. at 4; Def. Mem. at 11.) However, they disagree as to what *de novo* review entails.

When a plaintiff seeks review of a benefit determination under an ERISA plan, as Vega does here, "at trial the plaintiff[] would bear the burden of proving [her] entitlement to the benefits of the insurance coverage, and the defendant[] would bear the burden of establishing [her] lack of entitlement." *Santaella v. Met. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *see also Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007); *Walsh v. Long Term Disability Coverage for All Employees Located in United States of DeVry, Inc.*, 601 F. Supp. 2d 1035, 1040 (N.D. Ill. 2009). The *Diaz* court clarified the *de novo* standard that courts must use when reviewing an ERISA plan's benefit determination: "in these cases the district courts are not *reviewing* anything; they are making an independent decision about the employee's entitlement to benefits." *Diaz*, 499 F.3d at 643. Accordingly, where *de novo* review applies, "the question before the district court [is] not whether [Hartford] gave [Vega] a full and fair hearing or undertook a selective review of the evidence; rather, it [is] the ultimate question whether [Vega] was entitled to the benefits [she] sought under the plan." *Id.* The fact that *Diaz* reviewed a plan administrator's determination to deny benefits in the first instance, rather than to terminate them, is a distinction without a difference. *See, e.g.*, *Wilcynski v. Kemper Nat'l Ins. Cos.*, 178 F.3d 933, 935 (7th Cir. 1999) ("[A]pplying the *de novo* standard of review . . . the issue is whether

[the defendant] was correct in deciding to terminate [the claimant's] disability benefits."); *see also Walsh*, 601 F. Supp. 2d at 1040 (applying the *Diaz* standard to a termination case); *Ravesloot v. Admin. Comm. of the Employee Benefits Mgmt. Dep't for Baxter Int'l, Inc.*, No. 07 C 3019, 2008 WL 4547484, at *9 (N.D. Ill. Apr. 24, 2008) (applying *de novo* review to a case involving termination of benefits: "[a]t trial, [plaintiff] would bear the burden of establishing entitlement to long-term disability benefits; and [d]efendants would bear the burden of proving a lack of entitlement to those benefits"); *Marantz v. Permanenta Med. Group, Inc. Long Term Disability Plan*, No. 06 C 3051, 2008 WL 516712, at *4 (N.D. Ill. Feb. 21, 2008) (reviewing a plan's termination of benefits, the court explained that "*Diaz* held that in *de novo* review cases the court's role is not to determine whether plaintiff was afforded a full and fair review of her claim, but whether she was entitled to benefits"). Furthermore, there is nothing in *Diaz* that affirmatively limits its application to cases reviewing an initial denial of benefits, rather than a termination of benefits.

Plaintiff contends that if she can show that Hartford procedurally erred in terminating her benefits, we must reinstate her benefits without determining whether she is actually entitled to LTD benefits. (*See* Pl. Reply at 5.) In support of her argument, however, Vega cites cases that apply the arbitrary and capricious review standard used only when the ERISA plan grants discretion to the administrator. (*Id.* (citing, for example, *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-76 (7th Cir. 2003) (concluding that the arbitrary and capricious standard applied and ordering the district court to reinstate the claimant's benefits because the procedures used were arbitrary and capricious); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688-69 (7th Cir. 1992) (applying the arbitrary and capricious standard and concluding

it was not an abuse of discretion for the district court to order that the claimant's benefits had to be reinstated when the plan committed significant procedural errors and the claimant had been receiving benefits prior to its determination)).) She argues that it is counterintuitive for a claimant seeking review under the arbitrary and capricious standard, which is more deferential to the plan's decision, to receive reinstatement of her benefits for procedural errors while a claimant suing under the less deferential *de novo* standard cannot receive reinstatement for the same procedural errors. This argument is without avail.

Under the arbitrary and capricious standard, when procedural errors result in the termination of a claimant's benefits, they may be reinstated. *See Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998) (explaining that reinstatement is appropriate in cases that "involve claimants who were receiving disability benefits, and, but for their employers' arbitrary and capricious conduct, would have continued to receive the benefits"). However, after the court's reinstatement of benefits, the plan may conduct further review of the claimant's eligibility, utilizing non-arbitrary and capricious procedures. *See Hackett*, 315 F.3d at 776 (explaining that a remand to the plan administrator could result in the claimant's termination of benefits going forward, but not retroactively); *Halpin*, 962 F.2d at 697 (noting that the plan administrator may conduct further review). Under the arbitrary and capricious standard, reinstatement of benefits is the only means of remedying the harm to these claimants because the court *cannot* conduct an independent review of the plan's determination. However, courts applying *de novo* review must conduct such an independent review. *See Diaz*, 499 F.3d at 643. Thus, reinstatement of benefits is not needed to correct procedural errors because the independent review accomplishes that goal. *See, e.g.*, *Walsh*, 601 F. Supp. 2d at 1044 ("Because

the remedy for any procedural violations has already been granted when a court applies the *de novo* standard of review (*i.e.*, setting aside the plan administrator's decision), this court can discern no reason to inquire further into [d]efendants' compliance with ERISA's procedural regulations in relation to [the claimant's] LTD claim."). Accordingly, under *de novo* review of Vega's claim, we must determine whether Vega was entitled to benefits as defined by the Plan.

## ANALYSIS

### I. Motion to Strike

Before considering the merits of the motions for summary judgment, we must first address the Plan's motion to strike. The Plan moved to strike certain information and statements Vega cites in her memorandum and her Local Rule 56.1(a)(3) Statement of Facts ("Statement of Facts"). (Mot. to Strike ¶ 3.) Specifically, the Plan moves to strike Vega's references to the following: (1) information in the DOT regarding the dates certain occupation information was updated (Pl. Mem. at 11 n.4); (2) an Occupational Information Network ("O*NET") statement regarding the alleged job category of Production Laborers (*id.* at 12 n.5); (3) a definition of "sedentary" used by the DOT (Pl.'s 56.1(a)(3) Stmt. ¶ 33); and an O*NET description of the position of Office Clerk (*id.* ¶ 38a; Pl. Mem. at 13 n.6). The Plan argues that because this information was not part of the pleading, discovery, or disclosure materials, we cannot consider them. (Mot. to Strike ¶¶ 3-4.) It further argues that we may only review information that was part of the administrative record on *de novo* review of Vega's claim. (*Id.* ¶ 5.) Finally, it argues that the information is hearsay and therefore inadmissible for consideration at either the summary judgment or trial stage. (*Id.* ¶ 6.)

At this stage, we grant the Plan's motion to strike the evidence because it was not

included in the administrative record.  When a court reviews a benefit determination under *de novo* review, it has the discretion to "limit the evidence to the record before the plan administrator, or it may permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment."  *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994); *see also Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 490 (7th Cir. 2007) (reversing the district court's grant of summary judgment in favor of the defendant and granting plaintiff's motion to reopen discovery to introduce evidence not included in the administrative record because the court "need[ed] to hear the evidence in order to make an informed evaluation of the parties' claims and defenses"); *Marantz*, 2008 WL 516712, at *5 (noting that courts may allow the introduction of additional evidence not included in the administrative record, but declining to do so at the summary judgment stage).  However, "the proper place for such *de novo* review [is] at trial, not at the summary judgment stage."  *Marantz*, 2008 WL 516712, at *5; *see also Casey*, 32 F.3d at 1099 (explaining that the *de novo* standard of review involves making factual findings and that "the appropriate proceedings for such fact-finding is a bench trial and not the disposition of a summary judgment").  Accordingly, in deciding these motions for summary judgment, we will only consider the record before us.[9]  *Id.*

## II.  Vega's Motion for Summary Judgment

To succeed on her motion for summary judgment, Vega "bears the burden of proving that there is no genuine issue of material fact and that [she] is entitled to judgment as a matter of law."  *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007).  Accordingly, she must

---

[9] Our refusal to allow evidence that was not in the administrative record at this stage does not prohibit us from allowing such additional evidence at a later stage, if it is "necessary to enable [us] to make an informed and independent judgment."  *Casey*, 32 F.3d at 1099.

provide evidence that she is disabled under the terms of the Policy. *See Diaz*, 499 F.3d at 643.

The Policy defines "Total Disability" after the Insured Employee Occupation Period has passed

as an "Injury or Sickness" that renders the Insured Employee "(1) continuously unable to engage

in any occupation for which [she] is or becomes qualified by education, training or experience;

and (2) under the regular care of a license physician other than himself." (AR 00054.)

      To support her motion, Vega argues that Hartford's decision to terminate her benefits

relied on various mistakes of fact. (Pl. Mem. at 6.) For example, she makes the following

arguments: (1) Hartford misinterpreted Dr. Martinez's opinions regarding her ability to work by

mistakenly concluding that his opinion meant she could hold a full time sedentary position,

rather than a part time sedentary position (*id.* at 6-9); (2) Hartford wrongly concluded that Dr.

Reddy changed his opinion about Vega's ability to work, based on a conversation between Dr.

Reddy and the consultant hired by Hartford, Dr. Clark (*id.* at 9-10); (3) the case manager's

opinion does not support Hartford's decision because there was no evidence that the jobs she

concluded Vega could perform actually exist or are still performed in the manner described by

the 1991 Dictionary of Occupational Titles ("DOT") published by the U.S. Department of Labor,

on which the case manager relied (*id.* at 10-13); and (4) Hartford failed to consider Vega's

continued receipt of social security disability benefits in making its decision (*id.* at 13-14).

Unfortunately for Vega, she never affirmatively argues that her motion for summary judgment

should be granted because she was "Totally Disabled" as defined by the Policy. Although she

makes numerous arguments about ways in which Hartford erred in deciding to terminate her

benefits, she does not actually argue or demonstrate that she was disabled. In replying to the

Plan's criticism of her failure to demonstrate that she was disabled, Vega states that "she did

present evidence to this Court which provides a sufficient basis . . . for [us] to find that [Vega] was continuously disabled under the [Policy]." (Pl. Reply at 1.) However, in discussing the ways she demonstrated that she was disabled, Vega merely emphasizes the errors Hartford made, rather than explains how the evidence supports her position that she was disabled. (*Id.* at 1-4.) Vega attempts to succeed on her motion simply by demonstrating that Hartford did not "properly terminate[] benefits which had already been granted." (Pl. Mem. at 4.) However, as discussed above, Vega bears the burden of presenting evidence that she was disabled under the terms of the Policy. Because she did not present evidence that conclusively demonstrates she was disabled, we deny her motion for summary judgment.

### III. Defendant's Motion for Summary Judgment

To succeed on its motion for summary judgment, the Plan must demonstrate that Vega was not entitled to continued benefits. *See Diaz*, 488 F.3d at 643. In three pages of argument, without any citations to the record, the Plan contends that it must succeed on its motion because Vega's lupus, knee pain, low-back pain and panic/anxiety disorder did not prevent her from working in a sedentary occupation. (Def. Mem. at 12-14.) Specifically, the Plan refers to Dr. Martinez's July 2005 and December 2006 APS reports describing Vega's physical limitations and to his 2007 response regarding Vega's ability to perform sedentary work. (*Id.*) Additionally, the Plan generally refers to Vega's self-reports to Dr. Reddy that she was feeling "fine," "okay" or "better" than her previous visits (*id.* at 13) and her alleged management of her panic and anxiety with medication (*id.* at 14) as evidence that her panic/anxiety disorder did not prevent her from engaging in a sedentary occupation. The Plan's cursory analysis is insufficient.

The Plan has not satisfied its initial burden of identifying the parts of the record that

demonstrate there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2553. First, although the Plan cites to the record in the fact section of its memorandum, it does not do so in the analysis section. We are thus faced with the additional burden of matching the Plan's arguments in the analysis section with the facts discussed separately and, accordingly, with the appropriate citation to the Statement of Facts paragraph and the record. Because the Plan failed to cite to its Statement of Facts or to the record, we must guess about the basis for its conclusions and support for those conclusions.

Second, even after locating what we assume to be the appropriate statements of fact and the portion of the record that coincides with those facts, the Plan has not demonstrated that Vega was not entitled to benefits under the Plan documents. The most persuasive evidence that the Plan cites, Dr. Martinez's opinion regarding Vega's ability to engage in sedentary work (Def. Mem. at 13), is flawed. Although the Plan correctly argues that Dr. Martinez opined that Vega could return to sedentary work, there is an open question of fact as to whether that work included full or part time work. (*See* Pl.'s Mem. at 6; Pl.'s L.R. 56.1(a)(3) Stmt. ¶ 28, AR 00229.) This distinction is important for determining whether or not Vega was Totally Disabled. Furthermore, this evidence is not sufficient, considering the other evidence, to prove that Vega was not entitled to benefits.

The Plan acknowledges that Dr. Reddy opined twice in 2007, once in February and again in June, that Vega could not work due to her panic and anxiety disorder. (Def. L.R. 56.1(a)(3) Stmt. ¶¶ 54, 58, Mem. at 9.) However, the Plan argues that Vega's anxiety and panic disorder was controlled by medication, "bel[ying] any claim that those conditions prevented her in July 2007 from engaging in a sedentary occupation for which she was qualified." (Def. Mem. at 14.)

We cannot agree. As Vega points out in her response, Dr. Reddy clearly thought Vega's condition continued to prevent her from working in June 2007. (Pl. Resp. at 9; Def. L.R. 56.1(a)(3) Stmt. ¶ 58.) The Plan does not address Dr. Reddy's opinion regarding Vega's inability to work in its motion. Although the Plan may base its argument that Vega's condition did not prohibit her from working on Dr. Clark's review of Vega's condition, there are numerous factual disputes regarding that review and the implications of Dr. Clark's report that create a genuine issue of fact for trial. For example, a reasonable jury could agree with Vega that Dr. Clark's report regarding her conversation with Dr. Reddy does not actually indicate that Dr. Reddy changed his opinion regarding Vega's ability to work, but instead demonstrates that a third physician who has not actually seen Vega as a patient is of the opinion that she could work.

Given the lack of evidentiary support for the Plan's motion, Vega's Response to the Plan's motion and the briefs regarding Vega's motion, we are convinced that there is a genuine issue for trial in that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. Further, courts are prohibited from weighing the evidence at the summary judgment stage. *Casey*, 32 F.3d at 1098 (explaining that fact-finding and weighing the evidence should only occur at a bench trial and not on the disposition of a summary judgment motion); *Marantz*, 2008 WL 516712, at *4-5 (same). Although the Plan has presented evidence that may support its decision to terminate Vega's benefits, it ignores other evidence that indicates that Vega may be entitled to benefits. Because we cannot weigh contradicting evidence at the summary judgment stage, there is a genuine issue of material fact for trial. Accordingly, the Plan's motion for summary judgment is denied.

**CONCLUSION**

For the reasons stated above, we deny both motions for summary judgment and grant the

Plan's motion to strike.

_____
Honorable Marvin E. Aspen
United States District Judge

Date: July 21, 2009